William I. KOCH, Plaintiff,

v.

CHRISTIE'S INTERNATIONAL PLC, Christie's, Manson & Woods, Ltd. and Christie's Inc., Defendants.

No. 10–cv–2804 (BSJ).

United States District Court, S.D. New York.

March 18, 2011.

Elkan Abramowitz, Edward M. Spiro, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY, Bruce A. Wessel, Irell & Manella LLP, Los Angeles, CA, Layn R. Phillips, Marshall Alan Camp, Irell & Manella LLP, Newport Beach, CA, for Plaintiff.

Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants.

### Memorandum & Order

BARBARA S. JONES, District Judge.

Plaintiff William Koch ("Plaintiff") commenced this action against Defendants Christie's International PLC, Christie's, Manson & Woods, Ltd., and Christie's Inc. (collectively "Defendants" or "Christie's") on March 30, 2010, alleging causes of action for civil RICO pursuant to 18 U.S.C. § 1964, civil conspiracy to defraud, aiding and abetting fraud, and a violation of section 349 of the New York General Business Law. For the reasons set forth below, Defendants' motion to dismiss is GRANTED.

### BACKGROUND [1]

The present suit stems from the sale in the late 1980s of rare wine bearing the engraving "Th.J," supposedly signifying that they once belonged to Thomas Jefferson. For ease of reference, the wine will be referred to as the "Th.J wine" throughout. Christie's, one of the world's largest auction houses, auctioned a number of bottles of Th.J wine in the mid–1980s. In connection with these sales, Plaintiff alleges that Christie's advertised that the collection was authentic in its auction catalogues and generally promoted the Th.J wine. In 1988, Plaintiff William Koch purchased four bottles of Th.J wine from a third party, Hardy Rodenstock, who is not

named in this suit. Plaintiff contends that these mid–1980s representations by Christie's induced him to purchase the wine from Rodenstock. He alleges that, despite Christie's knowledge that the wine was likely counterfeit, it marketed the wine as authentic. This was part of Christie's "decades-long scam of promoting, authenticating, and selling supposedly rare wines that it knew to be counterfeit." (Pl. Br. at 1.)

### Specific Allegations in the Complaint

In November and December 1988, Plaintiff purchased four bottles of wine engraved with the initials "Th.J," supposedly indicating that they were once owned by Thomas Jefferson. (Compl. ¶¶ 59–60.) Plaintiff purchased the Th.J wine from Hardy Rodenstock, a German wine connoisseur who claimed to have discovered the cache of Jefferson's wine in Paris, France in the mid–1980s. (Compl. ¶¶ 28, 30–31.) Plaintiff paid a total of $311,804.40 for the four bottles. (Compl. ¶¶ 59–60.)

Plaintiff does not allege that any Defendant in this action sold him the Th.J wine or was directly involved in the sale. (*Id.*) Rather, Plaintiff alleges that Christie's had previously auctioned other Th.J bottles owned by Rodenstock in 1985, 1986, and 1987. (Compl. ¶¶ 39, 42, 54–57.) He claims that the wines were described positively in Christie's auction catalogues, usually with commentary by J. Michael Broadbent, a senior consultant and wine expert employed by Christie's. (Compl. ¶¶ 36–39.) These representations allegedly induced Plaintiff to purchase the Th.J wines from Rodenstock. (Compl. ¶¶ 59–60.)

Plaintiff alleges that Christie's representations and advertisements were made de-

---

1. Unless otherwise noted, the following facts are taken from the Plaintiff's complaint.

They are assumed to be true for the purposes of this motion only.

spite the fact that in 1985, Christie's and Broadbent "acquired direct and specific knowledge of facts and circumstances that challenged the authenticity of the Th.J wine." (Pl. Br. at 5; Compl. ¶ 32.) The counterfeit nature of the Th.J wine was allegedly revealed to Christie's by the experts at the Thomas Jefferson Memorial Foundation at Monticello ("Monticello") in what has been referred to as the "Monticello Report." (Compl. ¶ 34.) In April 1986, Monticello's staff informed Broadbent in writing that the Th.J wine had no connection to Thomas Jefferson. (Compl. ¶ 49.) Broadbent disagreed, and he spent years trying to persuade Monticello's experts that the Th.J wine was authentic. (Compl. ¶¶ 52, 63.) In spite of this information, Plaintiff alleges that Christie's continued to offer Th.J wine for sale, "advertising it in a manner intentionally and deceptively suggesting that the wine was clearly connected to Jefferson." (Pl. Br. at 6; Compl. ¶ 56.)

Plaintiff alleges that in 2005, he "learned for the first time that there were credible and serious questions about the authenticity of the Th.J wine." (Compl. ¶ 65.) In that year, a Boston museum contacted Plaintiff and asked if he would lend the Th.J bottles for exhibition. In preparation for the exhibit, Plaintiff contacted Monticello to obtain information regarding the authenticity of his wine. (*Id.*) From this conversation and subsequent investigation, Plaintiff obtained a copy of the Monticello Report for the first time. Plaintiff alleges that prior to 2005 "he had not known of the report." (*Id.*) Plaintiff undertook an investigation to determine the authenticity of his Th.J bottles. His efforts allegedly revealed that the bottles had no connection to Jefferson and were counterfeited by Rodenstock in the 1980s. (Compl. ¶¶ 66–76.)

Plaintiff filed suit against Rodenstock in August 2006. In connection with that suit, he interviewed Broadbent regarding Christie's role in the fraud. As a result of this investigation, he "began to suspect that Christie's sale of the Th.J wine was not an isolated event." (Pl. Br. at 8.) A wine expert confirmed that "numerous bottles in Koch's collection that Koch had purchased from Christie's are counterfeit or likely counterfeit." (Pl. Br. at 8; Compl. ¶¶ 139, 141–76.)

Plaintiff alleges that former Christie's employees have confirmed that Christie's knew that it often offered counterfeit wine for sale, including frequent sales from Rodenstock. (Compl. ¶¶ 110–30.)

In December 2008, Plaintiff purchased a bottle of 1870 Lafite for $4,200 at a Christie's auction. (Compl. ¶ 103.) Plaintiff admits that he thought the bottle was counterfeit prior to the auction. After the purchase, Plaintiff's experts allegedly confirmed their suspicions through testing. (Compl. ¶¶ 103–06.) Plaintiff relies on this purchase and on interviews of Christie's employees to allege that Christie's knowingly engages in sales of counterfeit wines because it "absolve[s] itself of responsibility for sales of counterfeits by including elaborate small print disclaimers in its auction catalogues" stating that the wine is sold "as is." (Pl. Br. at 9–10.)

Plaintiff filed the present action on March 30, 2010, alleging claims for civil RICO pursuant to 18 U.S.C. § 1964, civil conspiracy to defraud, aiding and abetting fraud, and a violation of section 349 of the New York General Business Law.

### LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief may be granted. "In ruling on a motion to dismiss for failure to state a

claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. Gen. Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991) (citation omitted). The Court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. *See Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009) (explaining that in deciding a motion to dismiss, a court "consider[s] the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inference in the plaintiff's favor") (citation omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations and internal quotation marks omitted). A plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009) (citation omitted).

## DISCUSSION

Plaintiff's RICO, aiding and abetting fraud, and civil conspiracy to defraud claims are based on his 1988 purchase of four bottles of the Th.J wine. Plaintiff's Section 349 claim is based upon the purchase of an allegedly counterfeit bottle of wine from Christie's in 2008.[2]

Defendant's primary argument in its Motion to Dismiss is that Plaintiff's claims are time-barred, and therefore fail as a matter of law.

## I. RICO Statute of Limitations

Defendants move to dismiss Plaintiff's RICO claim as time-barred. They argue that Plaintiff was on inquiry notice of his injury as early as 1993. Plaintiff filed suit against Christie's on March 30, 2010. Christie's argues that the statute of limitations expired, at the latest, in 2004.[3]

As an initial matter, the Court decides this motion on the basis of Plaintiff's complaint and attached exhibits, as well as four additional categories of documents: (1) news articles relating to the Th.J wine; (2) documents describing other suits regarding the Th.J wine; (3) the results of a test of the Th.J wine; and (4) Plaintiff's 2009 deposition testimony and court documents from a related action commenced by Plaintiff in an Illinois court in 2008.

■ A district court may take judicial notice of "the fact that press coverage,

---

**2.** Additionally, the Court notes that the complaint alleges that Plaintiff purchased 32 bottles of wine from Christie's between 1987 and 1990 that he now believes are counterfeit. (Compl. ¶¶ 142–176.) Plaintiff also includes allegations in the complaint that Christie's sold counterfeit wines to other consumers, often in cooperation with Rodenstock. (Compl. ¶¶ 107–137.) These allegations do not appear to relate to the Th.J purchases from Rodenstock. (*See* Compl. ¶¶ 177–209.) In these motions, neither party focuses on the

allegations of other counterfeit sales; rather, both parties focus on the Th.J wine purchases. Since these allegations lack the specificity required to state a cause of action, the alleged 32 purchases from 1987 to 1990 will be treated as background.

**3.** The parties to this action entered into a series of tolling agreements beginning in January 2008 which do not alter the Court's analysis. (Pl. Br. at 10 n. 1.)

prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice." *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (emphasis in original). Additionally, courts can consider court documents or matters of public record at the motion to dismiss stage where both parties had notice of their contents and the documents are integral to the complaint. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991). *See, e.g.*, *5–Star Management, Inc. v. Rogers*, 940 F.Supp. 512, 518 (E.D.N.Y.1996) (allowing the consideration of a transcript containing a party admission at the motion to dismiss stage where the parties do not dispute the authenticity of the admission); *Munno v. Town of Orangetown*, 391 F.Supp.2d 263, 269 (S.D.N.Y.2005) (judicial notice taken of submissions from a related state court action where the documents "allegedly contain statements by plaintiff which contradict the factual allegations contained in the complaint").

In determining what documents are appropriate to consider at this early stage, the Court notes that Plaintiff makes no specific objection to the consideration of these documents at the motion to dismiss stage, nor does he request conversion of this motion into a motion for summary judgment.[4] He refers to these allegations as "facts" and disputes Defendant's interpretation of these facts but does not contest the truth of the facts themselves. (Pl. Br. at 17.) Moreover, Plaintiff has not contested the authenticity of any document considered. These documents are directly implicated by Plaintiff's allegations in the complaint, and Plaintiff has had notice of and access to each document.

Because the facts are undisputed and there is no objection to their consideration at this stage, the Court has considered these four categories of documents along with Plaintiff's complaint in deciding the motion to dismiss.

### A. Facts Relevant to the Statute of Limitations

Defendants rely upon evidence from three points in time in which they allege Koch had inquiry notice of his alleged injury: (1) press reports from 1985–1993 regarding the authenticity of the Th.J wine; (2) Plaintiff's decision in 1993 to retain counsel to investigate a suit against Rodenstock alleging counterfeiting in Germany; and (3) Plaintiff's test of the Th.J wine in 2000 to determine its age.

#### (1) Press Reports Regarding the Th.J Wine: 1985–1993

Press reports as early as 1985 questioned the authenticity of the Th.J wine allegedly found by Rodenstock. On October 30, 1985, the New York Times published an article entitled "Oldest Bordeaux? Yes; Jefferson's? Maybe." (Lerner Decl., Ex. B.) The article quoted both Broadbent and Monticello researchers. Broadbent described Rodenstock as a "highly respected collector and connoisseur of fine old wine." (*Id.* at 2.) He described Christie's efforts to authenticate the bottles. The article also described in detail the concerns of Monticello researcher Cinder Goodwin. Goodwin described potential "red flags" regarding the wine's authenticity, specifically doubting the punctuation of

---

4. At one line in his opposition, Plaintiff asserts that Christie's argument "is improper on a motion to dismiss." (Pl. Br. at 19.) Plaintiff makes no other objection to the consideration of these documents anywhere else in his opposition brief. In contrast, defendants' opening and reply briefs contain lengthy discussions of this issue.

the initials on the bottles and the suspicious circumstances under which the bottles were found. (*Id.*)

Similar articles were published from 1985–1993 in the New York Times, the Wine Spectator, the Decanter and the Times London. (*See* Lerner Decl., Exs. E, F, G, H, I, J, K, L, M, N, O.) A New York Times article from April 1989 noted that "many wine fanciers are dubious [as to the wine's authenticity] because no one has proved that the wines were Jefferson's." (Lerner Decl., Ex. F.) A Wine Spectator cover story from March 1991 entitled "Authentic Old Bottles, but Were They Jefferson's?" referred to the Monticello Report as the source of the allegations questioning the authenticity of the Th.J bottles. (Lerner Decl., Ex. H at 2.) The article noted that no records of the Th.J wine appeared in Jefferson's otherwise meticulous records. It also observed that one of the primary obstacles to authenticating the wine was Rodenstock's "refus[al] to reveal whom he bought the bottles from and where they were located." (Id.) Additionally, Plaintiff correctly points out that many of the press reports suggested that, despite the controversy, the wine was actually authentic. (Pl. Br. at 18; Spiro Aff., Exs. B–1, B–2, C–1, C–2, C–3.)

Plaintiff admitted that he saw articles about disputes regarding the Th.J wine "in the 1990s." (Lerner Decl., Ex. A at 69.) Moreover, his attorneys admitted sending him copies or possessing three additional articles regarding the testing of the Th.J wine in 1992 and 1993. (Lerner Decl., Exs. P and Q.)

### (2) Lawsuit Against Rodenstock Regarding the Th.J Wine in Germany: 1992–1993

In 1992, Hans–Peter Frericks sued Hardy Rodenstock in a German court. The suit was based in part on testing of one of the Th.J bottles that supposedly revealed that the wine was actually produced no earlier than 1962. In press reports documenting the suit, Rodenstock is quoted as denying the allegations of counterfeiting and contending that the bottle tested was "manipulated." (Lerner Decl., Ex. J.) Plaintiff has admitted that in 1993 and 1995 he sought legal advice regarding the authenticity of the Th.J bottles related to the German suit. Specifically, in 1992 or 1993, "one of his lawyers" hired an attorney regarding the "Rodenstock/Frericks litigation in Germany." (Lerner Decl., Ex. R at 3, "William I. Koch's Answer to Defendant the Chicago Wine Company's Amended Affirmative Defenses").

### (3) Admissions of Plaintiff in 2008 Illinois Case

In a 2008 action filed in Cook County Circuit Court, *Koch v. Chicago Wine Company, et. al.*, Plaintiff testified in a sworn deposition that he first had questions regarding the authenticity of the bottles around 1992. (Lerner Decl. Ex. A at 18–19.) Plaintiff also admitted at that deposition that he had likely read press reports regarding the debate on the authenticity of the Th.J wine in 1992 and 1993. (Lerner Decl., Ex. A at 53–56.)

Finally, in the same deposition Plaintiff admitted that in 1999 or 2000, he instructed Mark Lessard, an employee, to obtain testing to evaluate the age of his Th.J bottles. Lessard hired the National Ocean Sciences AMS Facility Woods Hole Oceanographic Institutes. (*Id.* at 64–65.) The report was issued on October 16, 2000. Plaintiff admits receiving and reviewing the report shortly after receiving it. He said he considered the test results "neutral" as to whether the bottles were authentic. (*Id.* at 65.) The results concluded that "the most likely age ranges for the wine are 1680–1740 AD and 1800–1960

AD." (Lerner Decl., Ex. S "National Ocean Sciences Report.")

### B. Analysis

### (1) Discovery of the Injury Standard

 Civil RICO claims are subject to a four-year statute of limitations. *Rotella v. Wood,* 528 U.S. 549, 552, 120 S.Ct. 1075, 1079, 145 L.Ed.2d 1047 (2000). The clock begins to run when the plaintiff has "inquiry notice" of his injury, namely when he discovers or reasonably should have discovered the RICO injury. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988). Under the law of the Second Circuit, "the RICO statute of limitations ... runs even where the full extent of the RICO scheme is not discovered until a later date, so long are there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.* 328 Fed. Appx. 695, 697 (2d Cir.2009).

 Determining whether a plaintiff had "inquiry notice" is judged using an objective standard, requiring evaluation of all relevant circumstances. To impute inquiry notice to a plaintiff, the "triggering" information must directly relate to the allegations against defendants made in the subsequent lawsuit. *Staehr,* 547 F.3d at 427. Such a storm warning "need not detail every aspect of the alleged fraudulent scheme." *Id.* Rather, a person of ordinary intelligence would consider it "probable" that fraud had occurred. *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993). A court should find inquiry notice "as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." *Staehr,* 547 F.3d at 427. While determining inquiry notice often presents questions of fact more appropriate for a trier of fact, "nonetheless the test is an objective one

and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings." *Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1408 (S.D.N.Y.1996).

### (2) The Supreme Court's recent decision in *Merck v. Reynolds* does not apply to RICO cases.

Plaintiff Koch first argues that a recent Supreme Court decision, *Merck & Co., Inc. v. Reynolds,* —— U.S. ——, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010), rejected the inquiry notice "discovery of the injury" standard. (Pl. Br. at 13.) In *Merck,* investors brought a securities fraud class action against Merck, claiming that the company withheld material information from investors regarding known risks of the drug Vioxx. This information, plaintiffs claimed, affected Merck's share price and was intentionally not disclosed to investors. Defendant Merck moved to dismiss the complaint on statute of limitations grounds. The Court held that in a securities fraud case the statute of limitations does not begin to run until a plaintiff "discovers or would have discovered" facts constituting the violation, including the required mental state of the offender. *Id.* at 1798. Therefore, because plaintiffs could not reasonably have known about Merck's scienter until a later date, plaintiffs' suit was timely.

Plaintiff here argues that this rule is "equally applicable to RICO cases, because like claims for securities fraud, RICO claims require the plaintiff to allege scienter." (Pl. Br. at 14.) Defendants counter that the Supreme Court's rule in *Rotella v. Wood* is still controlling post-*Merck.* *Rotella,* Defendants argue, specifically notes that "in applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what

starts the clock." *Rotella,* 528 U.S. at 555, 120 S.Ct. 1075. Because the Supreme Court in *Merck* did not even mention, let alone expressly overrule *Rotella,* principles of stare decisis should govern this case, as the Supreme Court alone has the power to overrule its own precedents. (Def. Reply Br. at 8.)

■■■ This Court agrees with Defendant's interpretation of the current state of the law, and will apply the discovery rule as explained in *Rotella.* The rule of *Rotella* is clear, as quoted above. RICO actions are governed by a "discovery accrual rule," when a plaintiff discovered or should have discovered the injury, not when the mental state of the Defendant was discoverable. *Rotella,* 528 U.S. at 559, 120 S.Ct. 1075. *See also Oriska Ins. Co. v. All Staffing Inc.,* 2010 WL 1028726 at *1 (S.D.N.Y. March 11, 2010) (holding that the statute of limitations for RICO claims begins to run upon Plaintiff's discovery of the injury, not discovery of the other elements of the claim). In so deciding, the Supreme Court relied on the policy aims of the RICO statute, and the Clayton Act (upon which the RICO statute was based). Both statutes were designed to encourage plaintiffs to take responsibility for their own injuries and "encourage prompt civil litigation to supplement Government efforts to deter and penalize" the prohibited practices. *Id.* at 557, 120 S.Ct. 1075.

Further, the Court's decision in *Merck* concerned a claim for securities fraud, which is not alleged here. Moreover, the *Merck* opinion placed great emphasis on the statutory text governing securities fraud violations, which specifies that the statute of limitations expires two years "after the discovery of facts constituting the violation." 130 S.Ct. at 1796. This language does not govern the statute of limitations of Plaintiff's RICO claim, which is predicated on non-securities mail and wire fraud allegations.

Moreover, Plaintiff can cite to no authority applying the *Merck* rule to RICO actions. The Second Circuit has not yet addressed the application of *Merck* to RICO claims. The only circuit to mention *Merck*'s impact in a civil RICO case was the Seventh Circuit in *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.,* 610 F.3d 382 (7th Cir.2010), written by Judge Posner. In describing the civil RICO statute of limitations, Posner classified the *Merck* rule as merely an exception to the general "discovery of the injury" standard applied in RICO cases. *Id.* at 387.

Therefore, in light of principles of stare decisis as well as the policy aims of the RICO statute of limitations, this Court will apply the "discovery of the injury" rule as described in *Rotella.*

### (3) Plaintiff was on Inquiry Notice no later than October 2000

■■■ Applying the *Rotella* "discovery of the injury" rule, Defendants allege that Koch was on inquiry notice by 1993, when Plaintiff hired counsel in Germany to investigate the suit against Rodenstock alleging that the Th.J bottles were counterfeit. Defendants allege that even if inquiry notice was not found by 1993, Plaintiff's admission that he sent the Th.J bottle for testing in 2000 essentially constitutes an admission of inquiry notice.[5]

5. In response to these allegations. Plaintiff largely relies on *Merck v. Reynolds,* as described above. He contends that because inquiry notice depends upon when a reasonable person should have detected Christie's scienter, he was not reasonably on notice as to Christie's knowingly fraudulent conduct until after he began his investigation in 2005. The Court has already rejected this argument, and Plaintiff does not argue in the alternative that,

The Court agrees and finds that Plaintiff was on inquiry notice of his injuries no later than October 16, 2000, when he submitted the Th.J bottle for testing. By this date, a reasonable person should have been alerted to "storm warnings" that the Th.J wine was possibly counterfeit. Plaintiff does not dispute that he took the wine for testing because he feared that it was not authentic. This essentially constitutes an admission that he was aware of his possible injury no later than 2000. It is not necessary that Plaintiff had all the relevant information as of that date. Rather, from the date of the testing, Plaintiff had four years to investigate the circumstances regarding the alleged fraud. Moreover, Christie's endorsement of the Th.J wine and role in the controversy was well publicized by 2000, as the press reports cited by Defendant show. Plaintiff has shown no reason why a diligent investigation begun when Plaintiff tested the Th.J wine in 2000 would not have revealed Christie's role in the alleged fraud. Therefore, given the ample evidence showing Plaintiff was aware of his injuries no later than October 16, 2000, the statute of limitations began to run as of this date.

### (4) Equitable Tolling Does Not Apply

█ Plaintiff argues that, in any event, his claims cannot be time-barred because equitable tolling prevents Christie's from raising a statute of limitations defense because they concealed their fraudulent conduct.

█ Equitable tolling based on fraudulent concealment can apply in federal court if a plaintiff establishes that:

(1) the defendant wrongfully concealed material facts relating to defendant's

wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled.

*Corcoran v. New York Power Authority,* 202 F.3d 530, 543 (2d Cir.1999). A plaintiff attempting to apply fraudulent concealment must "plead each of these elements with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure." *National Group for Communications and Computers Ltd. v. Lucent Technologies Inc.,* 420 F.Supp.2d 253, 265 (S.D.N.Y. 2006).

Plaintiff pleads four allegations in support of his claim for equitable tolling on the basis fraudulent concealment. (Pl. Br. at 21.) They are taken as true for the purposes of this motion. First, in 2006, Christie's produced Broadbent for an interview regarding the Th.J wine, and Christie's and Broadbent both reaffirmed that the wine was authentic. (Compl. ¶ 84.) Second, also in 2006, Christie's tried to prevent another owner of the Th.J wine, Basil Shiblaq, from cooperating with Plaintiff's investigation or submitting his own wine for testing. (Compl. ¶¶ 86–89.) Third, from 1985–2006, Plaintiff alleges that Broadbent, as an agent of Christie's, made false public statements that Christie's experts had examined and authenticated the Th.J wine. (Compl. ¶¶ 40–41.) Fourth and finally, Plaintiff alleges that Broadbent, as an agent of Christie's, "engaged in a decades-long effort to persuade experts ... and prominent collectors ... that the Th.J wine 'indeed was the wine that Jefferson ordered in 1791,' despite the

---

even applying the *Rotella* standard, inquiry notice was not triggered. He merely states, as previously noted, that the assessment of evidence and factual determination regarding

when Koch should have learned of his injuries is "improper on a motion to dismiss." (Pl. Br. at 19.)

fact that Broadbent knew the wine had no connection to Jefferson." (Pl. Br. at 21, citing Compl. ¶¶ 52, 81–90.)

Defendants counter that Plaintiff cannot state a case for fraudulent concealment for a number of reasons. First, Plaintiff's allegations that Christie's impeded the investigation in 2006 cannot revive claims that were already time barred in October of 2004. (Def. Br. at 8.) Further, Plaintiff's allegations within the limitations period fail because Plaintiff did not plead that the concealment had the purpose or effect of preventing discovery of the claim. Moreover, Plaintiff cannot claim that he was "reasonably diligent" in pursuing his case throughout the period to be tolled.

As to Plaintiff's first two allegations, this conduct allegedly took place in 2006, after the statute of limitations expired in October of 2004. In determining whether equitable tolling could apply because of fraudulent concealment, the "tolling period cannot delay the expiration of a deadline when that deadline has already expired." *Nichols v. Prudential Ins. Co. of America,* 406 F.3d 98, 108 (2d Cir.2005). Therefore, the first two allegations cannot establish equitable tolling because they occurred in 2006, after Plaintiff's claim had already expired.

As a result, Plaintiff's claim for equitable tolling rests solely on his allegations that from 1986–2006, Broadbent, as an agent of Christie's, repeatedly asserted in public statements that the Th.J wine was genuine and frequently attempted to convince experts of the wine's authenticity despite knowing that the wine was counterfeit.

The Court finds that, even assuming that Christie's or its agent wrongfully concealed information regarding the authenticity of the wine, Plaintiff has not plausibly alleged how these actions actually prevented his discovery of Christie's role in his injury. Equitable tolling arguments are only successful "if the fraudulent concealment succeeds in depriving plaintiffs of notice; otherwise every fraudulent concealment claim would result in tolling." *Statistical Phone Philly v. NYNEX Corp.,* 116 F.Supp.2d 468, 483 (S.D.N.Y.2000). The doctrine is designed for application in cases where a plaintiff is unaware of his cause of action because of defendant's fraudulent conduct. *Torre v. Columbia University,* 1998 WL 386438 at *7 (S.D.N.Y. July 10, 1998). The key inquiry is "not whether the plaintiff had all the information available to him, but whether plaintiff knew enough to sue." *Ruso v. Morrison,* 695 F.Supp.2d 33, 47 (S.D.N.Y.2010) (internal quotation omitted).

Here, Plaintiff has pled no facts to allege that he did not have enough information to sue before 2004. Plaintiff alleges that Christie's knowingly made false statements supporting the authenticity of the Th.J wine. However, he cannot allege how these statements would have prevented him from investigating his claim. Plaintiff's undisputed knowledge and conduct demonstrates that he harbored suspicions regarding the wine as early as 1993. In 2000, he took the affirmative step of having the wine tested. He has not alleged any facts which would permit this Court to plausibly conclude that Christie's public statements or attempts to convince experts of the authenticity of the Th.J wine prevented his own investigation into the wine or into Christie's role in the allegedly fraudulent sales. Rather, Plaintiff himself alleges that his post–2005 investigation resulted in "overwhelming evidence" that the markings on the Th.J wine were not authentic. (Compl. ¶ 66–67.) And, he presents no explanation as to why such "overwhelming evidence" could not have been discovered earlier (as the bottle was in his

possession), let alone how Christie's' actions had the effect of preventing such an investigation.

Nor has Koch made any allegations, in the complaint or his moving papers, as to how he was "reasonably diligent" throughout the period to be tolled. The complaint is completely devoid of facts demonstrating that he was reasonably diligent in investigating the alleged fraud until 2005, after the statute of limitations had expired. Plaintiff even admitted in the 2009 deposition that he "forgot" about the Woods Hole testing until 2005. (Lerner Decl. Ex. A at 19.)

Consequently, Plaintiff's argument that the statute of limitations should have been equitably tolled fails, and his RICO claims are time-barred because he was on inquiry notice of his injury no later than 2000.[6]

## II. Civil Conspiracy to Defraud and Aiding and Abetting Fraud Claims

■■■ Plaintiff also brings claims for civil conspiracy to defraud and aiding and abetting fraud under New York law. These claims are also based on the allegations described above regarding the Th.J wine. Defendants move to dismiss these claims as time-barred. Plaintiff counters that "Christie's cannot establish at this stage of the litigation that prior to 2007 Koch had knowledge of facts from which the alleged fraud might reasonably have been inferred." (Pl. Br. at 32, internal quotations omitted.)

■■■ The statute of limitations for fraud claims under New York law is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff ... discovered the

fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. 213(8). Once a plaintiff has notice of the fraud "he is charged with whatever knowledge an inquiry would have revealed." *Kottler v. Deutsche Bank AG*, 607 F.Supp.2d 447, 461 (S.D.N.Y.2009) (internal citations omitted). As Plaintiff's claims rest solely on the purchases of the Th.J wine, the cause of action accrued no later than 1988. Therefore, under this theory, the statute of limitations would expire in 1994. In the alternative, the statute of limitations would expire two years from the time Plaintiff could have reasonably discovered the fraud. Based on our analysis above, the Plaintiff could reasonably have discovered the fraud no later than 2000, when he sent the Th.J wine for testing. It is clear that as of the testing of the wine in 2000, Plaintiff "had knowledge of facts from which the alleged fraud might reasonably be inferred." *Jeffrey BB. v. Cardinal McCloskey Sch., & Home for Children*, 257 A.D.2d 21, 689 N.Y.S.2d 721, 724 (3d Dep't 1999). Therefore, the latest date the statute of limitations could possibly have expired is 2002, well before this action was commenced.

■■■ Moreover, Plaintiff's attempt to apply equitable tolling to preclude Defendants' statute of limitations defense also fails. Under New York law, equitable tolling can apply where "the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir.2007). As is the rule under federal law, a plaintiff must show "due diligence" in pursuing the claim through the period to be tolled. *Id.* For the same reasons that Plaintiff could not use equitable tolling to save his federal claims, Plaintiff's

---

6. Because the Court decides Plaintiff's RICO claims, as well as his common law Eraud claims, on statute of limitations grounds, the

Court need not reach the causation and collateral estoppels arguments raised by Defendants.

state fraud claims are also time-barred. Equitable tolling does not apply where, as here, the Plaintiff has not pled how the actions of Christie's prevented his filing of a timely suit. Moreover, Plaintiff has utterly failed to plead facts alleging that he was diligently pursuing his claim during the period to be tolled. Therefore, Plaintiff's claims of civil conspiracy and aiding and abetting fraud are also dismissed as untimely.

### III. Defendant's Claim under New York General Business Law § 349.

██ Finally, Plaintiff brings a claim against Christie's for deceptive business practices under New York General Business Law § 349. While the complaint details many allegations of the sale of counterfeit wine against Christie's, Plaintiff s opposition brief clarifies that this claim is based solely on his 2008 purchase of the 1870 Lafite. (Pl. Br. at 39.)

██ To state a claim under Section 349, Plaintiff must allege that: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material way; and (3) the plaintiff was injured due to the deceptive act. *Anunziatta v. Orkin Exterminating Co., Inc.*, 180 F.Supp.2d 353, 361 (N.D.N.Y.2001). Plaintiff here alleges that Christie's knowingly sold him a counterfeit bottle of wine in 2008. He alleges because Christie's held a public auction and published catalogues, the act is sufficiently consumer-oriented. As to the second element, Plaintiff alleges that, under the objective standard of the law, the sale of counterfeit wine is inherently and materially misleading. Finally, as to the third element, Plaintiff alleges that he overpaid for the wine, because if Christie's had disclosed that the bottle was counterfeit, it would have sold for far less.

The Court finds that because Plaintiff admits that he knew that the bottle was counterfeit prior to making the purchase, he cannot claim that he was injured by Christie's misrepresentation. Therefore, he cannot sufficiently allege the third required element needed to state a claim under § 349. While it is true that Christie's' statements may have been materially misleading to the average reasonable consumer, Plaintiff has admitted that he was not misled. (Compl. ¶¶ 102–03.) While New York courts have made clear that reliance is not an element of the § 349 claim, a plaintiff must still show that "defendant's material deceptive act caused the injury." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (N.Y.2000). Here, the cause of his injuries was not Christie's' misleading statements, but Plaintiff's desire to gather evidence against Christie's.

Plaintiff attempts to claim in his opposition to the present motion that if Christie's had disclosed that the bottle was counterfeit "Koch would never have needed to spend $4,200 to purchase the bottle." (Pl. Br. at 41.) However, Plaintiff did not need to purchase the bottle; he chose to purchase it for the purpose of gathering evidence against Christie's. In this sense, he was no longer acting as a reasonable consumer. Rather, he was acting as an investigator who chose to pay $4,200 despite knowledge that the wine was worth far less. *See Sokolski v. Trans Union Corp.*, 53 F.Supp.2d 307, 316 (S.D.N.Y.1999) (holding that a plaintiff's § 349 claim alleging unfair debt collecting practices failed where the plaintiff never intended to actually dispute the validity of the debt and was fully aware of his rights).

Therefore, Plaintiff cannot state a claim under § 349 of the New York General Business Law, and Defendants' motion to dismiss this claim is GRANTED.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in its entirety. The Clerk of the Court is directed to close the case.

**SO ORDERED.**